UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Jacques Daboni,                                    Case No.  3:17-cv-502

                    Plaintiff

        v.                                         MEMORANDUM OPINION

Warden John Coleman, et al.,

                    Defendants


# I. INTRODUCTION

Jacques Daboni is an inmate at the Toledo Correctional Institution.  Daboni contends he has severe low back pain and is unable to walk.  He alleges having had a wheelchair upon his arrival at TOCI.  The wheelchair was taken away from him as the Defendants claim he is feigning an inability to walk.  He alleges being forced to scoot around the prison without a wheelchair and that the Defendants are deliberately indifferent to his serious medical needs.

Daboni instituted suit against Warden John Coleman, Kathleen Meehan-de la Cruz, M.D., Hannah Kroggel, Kim Henderson, Captain Mark Green, Captain Scott Mathias, Kelly Robertson, Lt. Melissa Cowell, Sgt. Ronnie Morton, Major Keith Fullenkamp, Lt. Michael Warren, and Bobbi David.   The nature of his complaint is an action under 42 U.S.C. § 1983 alleging an Eighth Amendment violation for deliberate indifference to his medical condition and necessary care.

In addition to his complaint, the *pro se* Plaintiff also moved for emergency injunctive relief (Doc. No. 3) which I construed as a motion for a temporary restraining order.  After having the benefit of a response from the Defendant on this issue, I denied Plaintiff's motion (Doc. No. 14),

set this matter on an administrative track, and set a briefing schedule for dispositive motions (Doc. No. 20).

On June 27, 2017, the Defendants filed their Notice of Compliance per my order requiring disclosure of names, addresses of witnesses, documents, and other evidence having a significant bearing on the claims and defenses. Their five page notice included the names and addresses of twenty-six individuals likely to have discoverable information. (Doc. No. 27). Additionally, the notice provided eight categories of documents along these same lines. (*Id.*)

Pending before me are multiple motions filed by parties, responses, and replies thereto. This Court has jurisdiction pursuant to 28 U.S.C. § 1331. For the reasons stated below, the Defendants' motion for summary judgment is granted. As that motion is dispositive of the case, the remaining motions are denied as moot.

## II. FACTUAL BACKGROUND

### A. Plaintiff's Allegations

Debone is an inmate at TOCI. His complaint alleges problems began on December 13, 2016, when he as assessed by Dr. Kathleen Meehan-de la Cruz, M.D. for severe back pain. At that appointment, Daboni alleges the doctor "made light of [his] situation saying everyone has back pains." (Doc. No. 1, p. 6). Daboni saw Dr. Meehan-de la Cruz again right before the end of December and continued to complain about severe back pains which he claims precluded him from walking. The doctor told him to "buy pills & muscle rub out of the store if [you're] in pain." (*Id.* at p. 7). The Plaintiff was not satisfied with Meehan-de la Cruz's response. The doctor then decided to admit Daboni into the infirmary for assessment.

Upon Daboni's admission to the infirmary, his wheelchair was taken from him and he was given a walker. He alleges attempting to "use the walker in vain, I would fall when I tried lifting the

walker off the ground." (*Id.*)  Despite his multiple tries, Plaintiff "was told by the nurses, that the Dr. instructed to keep trying despite my numerous falls.  I was sore & bruised all over but I would ask for pain pills & continue trying." (*Id.*)

Daboni alleges he learned from one of the nurses of the "Dr.'s Orders not to assess [Plaintiff] if [he] didn't walk out [out] of the cell." (*Id.* at p. 8).  During the Plaintiff's time in the infirmary, he was not assessed per Dr. Meehan-de la Cruz's orders but provided pain medication and encouraged to exercise by various staff members.  (*Id.*)

On January 3, 2017, Plaintiff was advised the doctor wanted to see him but he "had to walk out to see her." (*Id.* at p. 9).  On January 5, 2017, Dr. Meehan-de la Cruz went to see Daboni in the infirmary, told him he was "cleared medically" as she could not find anything wrong with him.  (*Id.* at p. 10).  Plaintiff again told the doctor about "the severity of [his] back pain that [wa]s preventing [him] from walking.  She told [him] to buy pills off the store & muscle rub & that [he] was cleared." (*Id.*)

Daboni was returned to the regular cell block in his wheelchair then physically removed from the wheelchair and placed on the floor.  Plaintiff continued to protest his inability to stand or walk to numerous TOCI employees to no avail.  He alleges that Hannah Kroggel, TOCI Healthcare Administrator, repeatedly "instructed everyone to leave [Plaintiff] on the floor." (*Id.* at p. 11).  Because of his inability to walk, Daboni's fellow inmates got him off the floor and onto his bed.  When it came time for meals, Plaintiff states he started to "scoot there, inmates seen me struggling & 6 of them picked me off the ground & carried me to chow." (*Id.* at p. 12).

As a result of the Plaintiff's scooting himself from location to location, he "was written up by [Lieutenant] Warren & taken to the hole, dragged out of my wheelchair & sat on the ground in my cell." (*Id.*)  Daboni was found guilty of this infraction and received "15 days time served & refer[red] to H.C.A. for Secondary anatomical.  I applaud that decision because this is not a

disciplinary issue, this is a medical issue." (*Id.*)  Thereafter, Daboni alleges he was allowed to leave "the hole" but had to walk out.  When the Plaintiff was unable to walk out on his own, he alleges he was given another 15 days in the hole.  (*Id.*)

Daboni contends he incurred additional infractions because of his inability to walk.  He continued to make unsuccessful requests for a chair to assist him in showering and other types of relief.  (*Id.* at pp. 13-14)  He characterizes the events described in his complaint as "cruel, & evil, & barbaric as they may seem are real & true."  (*Id.*)

B.  Defendants' Statement of Facts

Prior to being transferred to TOCI, Daboni was confined to the Meigs County Jail during the pendency of his trial.  According to Scott Trussell, a Major in the Meigs County Sheriff's Office, Daboni was confined to jail awaiting trial when he suffered an injury.  (Doc. No. 34-3).  A video recording of the incident was submitted as an exhibit in support of the Defendant's motion.  Major Trussell characterized the event as follows:

> The video being authenticated depicts Jacques Daboni lying on a mobile plastic bunk with blankets on it designed for inmates to sleep on.  The bunk was directly on the ground rather than any other surface.  After an Officer enters Daboni's cell, Daboni lifts his head up and attempts to stand.  After rising approximately four (4) inches to one (1) foot, Daboni slips back onto the bunk.  He decides not to stand up because of the fall.  Before the incident depicted in this video, Daboni was fully capable of walking on his own initiative unimpeded and without the assistance of any device.

(*Id.* at ¶ 5).

According to Dr. Meehan-de la Cruz, who is the Chief Medical Officer at TOCI, she reviewed the Plaintiff's prior medical records and describes his relevant history prior to his transfer to TOCI:

> I am familiar with Inmate Jacques Daboni (#A725394) ("Daboni").  He is a current inmate at TOCI.  Daboni has been incarcerated at TOCI since June 17, 2016.  Prior

to his incarceration at TOCI, Daboni's medical records show that he was incarcerated at the Corrections Reception Center ("CRC").

It is my opinion, based on a reasonable degree of medical certainty, after examining Daboni numerous times, that he has the ability to walk on his own accord, without the assistance of any device, and that he is feigning the inability to walk.

Daboni came to TOCI (from CRC) with a wheelchair. A review of Daboni's medical records shows that when the medical staff at CRC was contemplating taking Daboni's wheelchair, he claimed he could not walk. He was housed in that institution's infirmary where he did not walk; therefore he was permitted the wheelchair.

Pursuant to the records, prior to this incident at CRC, Daboni was able to get up on an exam table under his own power, without assistance, and could move from a lying position to a sitting position, then from a sitting position to a standing position, without issue.

(Doc. No. 34-1 at ¶¶ 3-5(a)).

Following his fall, the medical records show Daboni received a CT scan on October 13, 2015, which showed no fractures and states a "normal" impression. (Doc. No. 34-1 at p. 6). Two and a half months later, Daboni underwent an MRI with the findings appearing to be normal. (Doc. No. 34-1 at p. 7). A hand-written notation by the physician on the MRI report, noted, "MRI is essentially normal. There is no reason for him to be in wheelchair. Please check if home health PT will come to jail or if we can take him to P.T. for few sessions." (*Id.*) These tests were completed during Daboni's confinement at the Meigs County Jail.

After Plaintiff's criminal conviction, he was sent to the Corrections Reception Center before transfer to TOCI on June 27, 2016. (Doc. No. 34-1, ¶ 3). Thereafter, Dr. Meehan-de la Cruz noted:

On June 28 and July 1, 2016, Daboni refused two appointments with Advanced Level Providers. He was also a "no-show" for a Nurse Sick Call appointment on October 21, 2016.

(*Id.* at ¶ 5b).

At TOCI, Daboni was seen during a nurse sick call on November 28, 2016. (*Id.* at ¶ 6).

During that visit he requested a back brace. (*Id.*) Meehan-de la Cruz first saw Daboni in December 2016:

> I performed two separate physical assessments on Daboni, the first on December 13, 2016, and the second on December 27, 2016. As a result of these assessments, I came to the conclusion that Daboni has the ability to walk on his own accord without assistance, despite his complaints and actions to the contrary.
>
> On December 13, 2016, Daboni reported to me that he was experiencing non-radiating lower back pain (meaning that the pain was localized in his lower back). Daboni reported that he had no weakness, numbness, tingling, or bowel or bladder problems, all of which would reflect a possible neurological problem which could impact mobility. On his exam, Daboni was normal in appearance without any distress, and the neurological exam (which included his reflexes, the strength and size of his muscles, skin appearance and hair distribution) was normal.
>
> a. Localized low back pain alone, without neurological symptoms or examination findings, would not prevent Daboni from walking. While Daboni refused to rise from a sitting position, he did eventually get out of his wheelchair while using a sink to pull himself to standing and experienced no apparent discomfort while doing so. Daboni claimed that if he had a back brace, he would be able to walk. I provided him with a back brace. He also acknowledged that his alleged pain was worsened due to his inactivity, i.e. his wheel chair confinement.
>
> b. During the appointment, I educated Daboni about back health. I instructed him about self-management of low back pain explaining that he should take over-the-counter medication to help combat it, and that he needed to perform physical therapy exercises. I provided him with printed information illustrating the exercises he needed to perform on a daily basis. I also informed Daboni that staying in the chair and not moving at all would only make his pain worse.
>
> c. I informed Daboni that he would be reassessed in two weeks, and, if he was not out of his wheelchair and walking, the brace would be discontinued. I told him that he would be required to demonstrate his physical therapy exercises. I informed him that the pain should not preclude him from walking, and that walking would actually help him.

(*Id.* at ¶ 8).

> Meehan-de la Cruz saw Daboni again on December 27, 2016:

> I completed a follow-up exam on Daboni, who reported that he continued to use the wheelchair exclusively, despite my prior instructions. When Daboni was instructed to demonstrate the physical therapy exercises that he had been given, he refused to do so. Additionally, records indicate he failed to purchase over the counter medication for self-management of his low back pain.

a. While Daboni continued to claim that he could not walk, his strength test revealed otherwise. The strength in his hip flexors, quadriceps, hamstrings, calves, ankles and feet were all tested, and Daboni had normal strength. (His different muscles were tested by having him lift, extend or flex the different muscles against resistance).

b. Additionally, Daboni had the strength to lift both of his legs high off the floor while sitting in his wheelchair. He was able to stand from a sitting position, and return to the sitting position with ease. While he refused to attempt to stand without the help of the sink, his efforts showed that he could have done so without it if he were inclined to do so.

c. At the conclusion of the exam, I informed Daboni that the wheelchair would be discontinued because he did not need it, and it was causing him the ongoing harm of deconditioning. I informed Daboni that he would be given a walker, and would be permitted to continue to use the back brace. He stated he would not be able to function in the general population of the prison with a walker. He also stated that he would refuse to be housed in the infirmary.

d. Daboni was admitted to the infirmary and provided proper instruction on walker use. I gave Daboni another copy of the physical therapy exercises and, again, instructed him to purchase over-the-counter mediation as needed.

(*Id.* at ¶ 9).

Daboni remained in the infirmary until January 5, 2017, when Meehan-de la Cruz went to his cell to assess him. Meehan-de la Cruz reported that during his confinement in the infirmary, the medical records reflected Daboni would not come out of his cell, was given instruction on proper walker usage, and continued to complain of lower back pain. (*Id.* at ¶¶ 9-10). She noted his ability "to transfer from lying to sitting without issue." (*Id.* at ¶ 11). Daboni continued to deny "weakness, numbness, tingling, or bowel or bladder problems, all of which would reflect a possible neurological problem which could impact mobility," however he "could not demonstrate [the] physical therapy exercises." (*Id.*) As a result of her assessment, Daboni was discharged from the infirmary. (*Id.*)

Before removing Daboni's wheelchair access, Meehan-de la Cruz took other measures to confirm her assessment:

Prior to discontinuing Daboni's wheelchair, I had a licensed independent social worker evaluate Daboni. He was found to suffer from no mental illness that would cause the incorrect perception of the inability to walk – e.g. he does not suffer conversion disorder, and I had two other medical professionals review his records. Both physicians agreed with the conclusion that the wheelchair was not needed and

that there was nothing keeping Daboni from walking on his own accord without assistance.

(*Id.* at ¶ 14).

Following Daboni's release from the infirmary, Meehan-de la Cruz participated in a meeting with Warden Coleman, Deputy Henderson and Healthcare Administrator Kroggel to discuss Daboni's medical needs:

> I explained that Mr. Daboni was ambulatory and did not have any medical need for a wheelchair or other transport accommodations. At the conclusion of that meeting all participants indicated that they understood that Mr. Daboni was capable of walking to any accessible location in the prison at his own initiative and without assistance.

(*Id.* at ¶ 20).

From the time Daboni was released from the infirmary, he continued to scoot around the prison on the ground. The Plaintiff's conduct of scooting to get from location to location resulted in security difficulties as well as agitating the inmate population who expressed their disapproval of the situation. Additionally, Daboni's refusal to comply with the Defendants' directives on transportation resulted in conduct reports and rule violations. (Doc. No. 3404 at pp. 3-5). According to the Defendants' records, Daboni only purchased over-the-counter pain medication once, in June 2017. (*Id.* at ¶ 15).

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the movant demonstrates there is no genuine dispute of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). All evidence must be viewed in the light most favorable to the nonmovant, *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 390 (6th Cir. 2008), and all reasonable inferences are drawn in the nonmovant's favor. *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 535 (6th Cir. 2014). A factual dispute is genuine if a reasonable jury could resolve the dispute and return a verdict in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A disputed fact is

material only if its resolution might affect the outcome of the case under the governing substantive law.  *Rogers v. O'Donnell*, 737 F.3d 1026, 1030 (6th Cir. 2013).

## IV. PLAINTIFF'S MEDICAL INDIFFERENCE CLAIM

### A.   The Parties' Positions

I agree the Plaintiff's allegations are to be considered a medical indifference claim alleging a violation of the Eighth Amendment to the United States Constitution and alleging a civil rights violation pursuant to 42 U.S.C. § 1983.

The Defendants move for summary judgment as a matter of law.  They seek summary judgment on the basis of qualified immunity, immunity under the Eleventh Amendment and, the Plaintiff's failure to exhaust his administrative remedies under the Prison Litigation Reform Act.

In contrast, the Plaintiff contends there are genuine issues of material fact in dispute which require denying the Defendants' motion for summary judgment.

### B.   Qualified Immunity Standard

Qualified immunity shields "government officials performing discretionary functions… from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

The analysis employed by the Sixth Circuit in determining qualified immunity focuses on whether a constitutional right was violated and whether that right was clearly established at the time such that a reasonable official would have understood that his behavior violated that right.  *Occupy Nashville v. Haslam*, 769 F.3d 434, 442 (6th Cir. 2014), citing *Saucier v. Katz*, 533 U.S. 194 (2001).  In

*Pearson v. Callahan*, 555 U.S. 223, 236 (2009), the Supreme Court approved disregarding the mandatory analytical sequence adopted in *Saucier* and allowed district courts to "exercise their sound discretion in deciding which of the two prongs in the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."

While the order of these questions is left to the discretion of the district court, "if either one is answered in the negative, then qualified immunity protects the officer from civil damages." *Goodwin v. City of Painesville*, 781 F.3d 314, 321 (6ᵗʰ Cir. 19, 2015), citing *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6ᵗʰ Cir. 2013). Once the defense of qualified immunity is raised, the burden shifts to the plaintiff to prove defendants are not entitled to qualified immunity. *Rodriquez v. Passinault*, 637 F.3d 675, 689 (6th Cir. 2011).

C.   Violation of a Constitutional Right

In *Estell v. Gamble*, 429 U.S. 97, 104 (1976), the Supreme Court held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,'" and amounts to a violation of the Eighth Amendment. A claim under the Eighth Amendment requires both an objective and a subjective component. *Wilson v. Seiter,* 501 U.S. 294, 298 (1991). The objective component requires a finding that the deprivation alleged be "sufficiently serious." *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). The subjective component requires that prison officials acted with deliberate indifference to the prisoner's serious needs. *Id.*

The objective component of this analysis can proceed under one of two roads:

> First, if a plaintiff suffered from a minor or non-obvious medical condition, he can show that his condition was objectively serious "if it is 'one that has been diagnosed by a physician as mandating treatment.' " *Id.* at 897 (quoting G*audrault v. Municipality of Salem*, 923 F.2d 203, 208 (1ˢᵗ Cir. 1990)). Second, "where a plaintiff's claims arise from an injury or illness 'so obvious that even a layperson would easily recognize the necessity for a doctor's attention,' " the plaintiff can meet the objective prong by showing "that he actually experienced the need for medical treatment, and that the need was not addressed within a reasonable time frame." *Id.* at 899-900 (quoting *Gaudreault*, 923 F.2d at 208).

*Mattox v. Edelman*, 851 F.3d 583, 598 (6ᵗʰ Cir. 2017).

In this case, there is no dispute the Plaintiff suffered a fall while at the Meigs County Jail. The Plaintiff received a cervical spine CT in October 2015 and an MRI in January 2016, prior to his transfer to TOCI. Both medical scans revealed no injuries.

The Plaintiff did not seek medical intervention for five months after his transfer to TOCI. On November 28, 2018, when he was seen by medical staff during a nurse sick call, he requested a back brace. Within thirty days of that initial nurse sick call, Dr. Meehan-de la Cruz conducted two examinations of Plaintiff, reviewed his previous medical records, and admitted him to the infirmary for approximately one week. She also ordered an evaluation by a social worker, and was informed Daboni refused to use his walker or do the recommended exercises to help his pain. She again saw him in the infirmary, as he continued to refuse to come out of the cell, and performed another assessment of his condition. After consulting two other colleagues regarding her medical conclusions, considering the social worker's evaluation, as well as Daboni's current and prior medical history related to his fall, Meehan-de la Cruz discharged him from the infirmary without a wheelchair. After his discharge, the Plaintiff purchased over-the-counter medication, Naproxen, once in June 2017.

In response, Daboni argues that Meehan-de la Cruz admitted he has "congenital narrowing of the distal lumber spine with mild bilateral neuroformainal narrowing" and "[t]his admission contradicts Defendants['] whole argument that Plaintiff is feigning his inability to walk." (Doc. No. 40 at p. 2). The MRI done in January 2016 - prior to Plaintiff's transfer to TOCI -was addressed by Meehan-de la Cruz as follows:

> Daboni's medical file indicates he received a CT scan of his head as well as an MRI of the cervical, thoracic, and lumbar spine. He suffered no fracture or other acute traumatic injury in his lumbar spine from his alleged fall. The only irregularity from his MRI is congenital malformation of his lower spine. This is a fairly common condition that seldom requires treatment. Treatment does not include use of a wheelchair. Plaintiff's specific irregularity would absolutely not cause a symptom that would render him immobile.

(Doc. No. 34-1 at ¶ 16). This statement by Meehan-de la Cruz, when read in its entirety, lends support to the Defendants' position that Plaintiff was not suffering from a medical condition which prevented him from walking.

The Plaintiff charges that when Meehan-de la Cruz learned he was scooting around the prison she did not re-assess him nor refer him to a specialist. The Plaintiff also offers declarations from inmates who observed Daboni's conduct and contend his treatment is tantamount to cruel and unusual punishment. (Doc. Nos. 40-1, 40-2, and 40-3).

In support of his position, Plaintiff cites to *Brown v. Lamanna*, 304 Fed. Appx. 206 (4th Cir. 2008). In that case, an inmate brought a *Bivens*[1] action challenging the prison conditions as violative of the American with Disabilities Act and the Rehabilitation Act. The Fourth Circuit reversed the district court's grant of summary judgment in the defendants' favor because the evidence raised a genuine issue of material fact as to whether the medical records indicated the plaintiff was able to "ambulate without assistance." *Id.* at 208. Upon examination of the records, the appellate court found the records did not state whether the plaintiff could ambulate without assistance or that devices, such as crutches or a wheelchair, were medically necessary. *Id.* The circumstances in Daboni's case are markedly different as his medical records, inclusive of testing and assessments by various medical personnel, provide valid reasons for Meehan-de la Cruz's conclusion the Plaintiff is capable of walking.

Having reviewed the arguments and evidence by both sides, I find the Plaintiff has not presented competent evidence which raises a genuine dispute of material fact as to his medical condition. Instead, the Plaintiff's complaints are of the type which do not come within the ambit of an Eighth Amendment violation:

> Similarly, in the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind." Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not

---

[1] *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).

state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.

*Estelle*, 429 U.S. at 105-06.

As the Plaintiff has failed to establish a genuine dispute of material fact regarding a sufficiently serious medical need, he cannot establish a constitutional violation under the Eighth Amendment for deliberate indifference. Accordingly, the Defendants are entitled to qualified immunity as a matter of law.

D.   Immunity Under the Eleventh Amendment

I also find there is no dispute that the Defendants, to the extent they are named in their official capacities, are entitled to Eleventh Amendment immunity. With regard to official capacity claims, a state and its officials are not considered persons when sued in their official capacity for money damages. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 70-71 (1989). The Eleventh Amendment bars suit against the state or its agencies unless the state has given express consent. *Pennhurst St. Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). As Ohio has not given express consent to be sued in federal court, *Mixon v. State of Ohio*, 193 F.3d 389, 397 (6th Cir. 1999), the state or its instrumentalities are immune from suit for money damages. *Wingo v. Tenn. Dept. of Corr.*, 499 Fed. Appx. 453, 454 (6th Cir. 2012).

E.   Exhausting Remedies under the PLRA

The Prison Litigation Reform Act requires a prisoner to exhaust all available administrative remedies before filing suit in federal court. 42 U.S.C. § 1997e(a). To meet this requirement, "a prisoner must adhere to the institutional grievance policy, including any time limitations." *Risher v. Lappin*, 639 F.3d 236, 240 (6th Cir. 2011) (citing *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006)).

In this case, it is undisputed "Daboni did not exhaust the grievance process for any claims against any person other than Dr. Kathleen Meehan-de la Cruz as he ma[de] no attempt to identify

or even describe any prison official as required by the Ohio Administrative Code." (Doc. No. 34-5 at ¶¶ 9 and 18).

As Daboni does not dispute he failed to exhaust his administrative remedies under the PLRA challenging the conditions of his confinement, his claims against the remaining named Defendants are without merit.

## V. CONCLUSION

For the reasons stated above, the Defendants' motion for summary judgment (Doc. No. 34) is granted. The Defendants' motion to strike Plaintiff's discovery request (Doc. No. 23) is denied as moot.

Plaintiff's motions to proceed *in forma pauperis* (Doc. No. 2), for reconsideration (Doc. No. 21), second motion to proceed *in forma pauperis* (Doc. No. 22), objecting to Defendants' motion for leave (Doc. No. 24), to compel discovery and for appointment of counsel (Doc. No. 26), for leave for deposition by oral examination (Doc. No. 30), and, for appointment of counsel (Doc. No. 39), are all denied as moot.

So Ordered.

s/ Jeffrey J. Helmick
United States District Judge